Exhibit B

DEFENDANT'S MEMORANDUM OF LAW – PROVIDENCE SUPERIOR COURT CASE NO.: 24-5896

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-cr-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 2 of 56

**STATE OF RHODE ISLAND**       **SUPERIOR COURT**
**PROVIDENCE, SC**

| | |
|---|---|
| **STATE OF RHODE ISLAND, et al** : | |
| **Plaintiffs** : | |
| : | |
| **VS.** : | **C.A. No.:**    **PC-2024-05896** |
| : | |
| **PREFERRED PROPERTY** : | |
| **SOLUTIONS, LLC, et al** : | |
| **Defendants** : | |

## DEFENDANT PREFERRED PROPERTY SOLUTIONS, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Now comes the Defendant, Preferred Property Solutions, LLC (hereinafter, "PPS"), and hereby submits this Memorandum of Law in Support of its Objection to the Plaintiffs' Motion for Preliminary Injunction. This Court should not grant the Plaintiff's request for a preliminary injunction impeding PPS's right to sell its lawfully begotten real property located at 58 Pekin Street, Providence, Rhode Island (hereinafter, the Property). PPS, not its members Kyle Seyboth (hereinafter, "Seyboth" and Christopher Messier (hereinafter, "Messier"), have not violated *any* provision of the Rhode Island Deceptive Trade Practices Act, R.I.Gen.Laws §§6-13.1-1, *et seq.* (hereinafter, the DTPA"). The Plaintiffs' Motion is based upon allegations contained in its sloppy "shotgun" complaint that have been clearly proven to be false since the filing of this action. *See Sogbuyi-Whitney v. Caremark PHC, LLC*, 2024 WL 324552 (U.S.D.R.I. 2024) *2 (stating that shotgun pleadings

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 3 of 56

that lump all litigants into one category is disfavored). Stated plainly, the Plaintiffs'
do not have a reasonably likelihood of success on the merits of their slanderous case
filed against PPS, Seyboth, and Messier. The Plaintiffs' Complaint is based on lies.
Now that the relevant witnesses have been deposed, it is clear that the Complaint is
based on false and misleading information provided by the Delva family.

The Delva witnesses have no credibility. They have lied, signed false
affidavits, and pretended not to understand English and as a result they have
maligned the reputations of Seyboth, Messier, and attorney Louis Catarina. The
Delvas, aided by the Plaintiffs, have smeared these Defendants to avoid a bargained
for exchange that simply didn't work out the way they hoped it would. The
Complaint was brought without even a minimal level of investigation by the
Plaintiffs into the veracity of the Delva's claims against the Defendants. The
uncontradicted evidence, which the Court will read in this Memorandum and see
firsthand at the hearing, demonstrates that Marie Delva speaks and reads enough
English to understand the contents of a basic purchase and sales agreement. The
evidence demonstrates that Marie Delva and Jean Marie Delva sold their house to
PPS to avoid foreclosure with the intent that their daughter, Joana Delva, would have
one year to purchase it back from PPS.

The evidence shows that neither member of PPS directly negotiated with the
Delvas. In fact, Mr. Seyboth never met the Delvas for over one year after the closing

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 4 of 56

of the sale of the Property. Lowell Williams came to PPS and proposed that PPS buy the Property from the Delvas and agree to give Joana Delva one year to purchase the Property from them. PPS accepted that proposal. The documents were given to the Delvas who signed them, without reading them, asking questions, or requesting that the documents be translated. Marie Delva explained that she didn't read them because she was tired and didn't have time. She admitted that she would have known that the purchase and sales agreement was a contract to sell her house, if she had read it. Marie admitted that she is the one who told her husband that it was a refinance, without telling him that she didn't bother to read the sale documents.

While this went on, Joana Delva was present with her parents. Unlike her parents, Joana does not pretend that she doesn't speak and read English. Joana saw the documents but says she didn't bother to read them either. She admitted that she knew that her parents were signing the documents to convey the Property to PPS but didn't speak up. After her parents signed their purchase and sales agreement, Joana signed one the next day giving her one year to buy the Property from PPS and keep it in the family. However, due to her inability to maintain employment and lack of credit, Joana failed to do so within the one year time frame.

Once Joana's time to purchase the Property was up, Seyboth began to market the Property. At that time, due to sellers' remorse, the Delvas began pretending that they didn't understand the transaction. They went to the police and the Plaintiffs

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 5 of 56

seeking to unwind their bargained for exchange with PPS. In doing so, they provided false affidavits. Thankfully, through deposition testimony and recorded telephone calls, their lies have been exposed. The inescapable conclusion is that the Plaintiffs do not have a reasonable likelihood of success. In fact, at this stage, the Defendants plan to file a Motion for Summary Judgment seeking dismissal of the Complaint as to PPS, Seyboth, Red Ballon Capital, and the Seyboth Real Estate Team, Inc.

Not only do the Plaintiffs not have a reasonable likelihood of success, they fail to meet the remaining requirements for an injunction. Whether applying all factors for a preliminary injunction, or just the limited test that the Plaintiffs suggest this Court adopt, the Plaintiffs fail to carry their burden. This case is about one transaction. It does not implicate a larger public interest. The Delvas signed a valid, unambiguous, and clear purchase and sales agreement to sell their home to PPS for $100,000.00 to avoid foreclosure. They claim that in doing so, they were "bilked" out of their equity in a home now claimed to be worth $450,000.00. The Delvas do not lament the loss any sentimental value. They merely complain about a loss of equity. This case is about money damages in a single isolated situation. As such, there is no threat to a larger public interest and there is no irreparable harm.

Despite the hyperbole in their absurd Complaint, the Plaintiffs have not established a wide ranging scheme by any of the Defendants, particularly PPS, Seyboth and Messier, to deceive the public. This is a limited dispute between the

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-DR-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 6 of 56

Delvas and the Defendants as to one sale of Property. If in the end, the Court finds in favor of the Plaintiffs, the Court can order that PPS be disgorged of any financial benefit derived from the sale of the Property to a third party. In doing so, the Delvas would have been adequately compensated. The Court could also then restrain and enjoin the Defendants from similar conduct in the future. However, there is no evidence that PPS, Seyboth, or Messier engaged in any illegal conduct such that the public interest has been harmed and that their right to sell Property they purchased should continue to be restrained.

For the reasons stated herein, this Court should deny this Motion for Preliminary Injunction. PPS should be allowed to proceed with the eviction of the Delvas, who have been living in the Property for free since July 2023, and the sale of the Property.

## FACTS

The allegations contained in the Complaint as they pertain to PPS, Seyboth, and Messier are completely and utterly baseless and false.[1] Through discovery, the Defendants have obtained the statements under oath of Kyle Seyboth and Lowell Williams taken by the Plaintiffs.[2] *Exhibit 13; Exhibit 12*. The Defendants have also

---

[1] The Complaint is so unfounded that the Defendants have warned counsel for the Plaintiffs that if an amended complaint is not filed that there will be a motion seeking Rule 11 sanctioned filed.

[2] Williams attend the statement under oath without counsel. Counsel for the Plaintiffs attempted to take advantage of Williams being without an attorney and

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-cr-10027    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 7 of 56

obtained a series of surreptitiously recorded phone conversations recorded by the Delvas' daughter, Sheila, involving Seyboth, Williams, Sheila, Joana, Marie and Jean Marie Delva. *Exhibit 3; Exhibit 9*. Additionally, the Defendants have taken depositions of Joana, Sheila, and Marie Delva. *Exhibit 8; Exhibit 10; Exhibit 1*. All of that information makes it abundantly clear the PPS, Seyboth, and Messier have not violated the law. If anyone has been dishonest in this case it is Marie and Joana Delva themselves. The following is a summary of the testimony and information gathered to this point which makes it clear that there is no likelihood of success for the Plaintiffs.

In June 2023, Thelma Howard was asked by Lowell Williams to go to the Property to meet with the owners. Williams had seen the house in the foreclosure listings and wanted information related to the intent of the owners. Howard reported back that the owners were interested in avoiding foreclosure and would meet with Williams. *Exhibit 12*, at p. 12, ln. 7-15. Howard was one of 250 independent contractors work as agents through The Seyboth Team brokerage but was unknown to Seyboth and was not under his direct management. *Exhibit 13*, at p. 11, ln. 17-20; p. 14, ln. 11-24. Seyboth does not recall ever even meeting Howard in the past.

---

engaged in an abusive interrogation of Williams asking questions that would never withstand an objection in Court. Court berated and harassed Williams through the interrogation. Counsel repeatedly asked Williams the same questions and mischaracterized his testimony throughout the examination in an effort to confuse Williams. Luckily, counsel's efforts were ineffective.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

2399    1:25-DK-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 8 of 56

The following day, Williams met with Marie and Joana Delva. He discussed the possibility of assisting them in avoiding foreclosure. *Exhibit 12*, at p. 13, ln. 1-8. Williams and Joana then had a series of discussions which ultimately culminated in Williams telling Joana that he had a contact that may want to purchase the Property and be willing to hold it for a period of time for Joana to buy it back. *Id.*, at p. 96, ln. 15-21. Williams then contacted Seyboth and asked him if he would be interested in purchasing the Property prior to foreclosure. Williams had worked as a contractor on constructions projects for Seyboth previously and would often refer real estate opportunities to Seyboth. *Exhibit 13*, at p. 14, ln. 15-16. Seyboth does not employ nor invest with Williams. *Id.*, at pp. 14-15. Seyboth reviewed the Property online and told Williams he would be willing to give the owners $100,000.00.

Williams later asked Seyboth if he would be willing to allow Joana to have up to one year to purchase the Property back. *Id.*, at pp. 14-15. Seyboth and Messier agreed to hold the Property for one year provided that Joana purchased the Property for $280,000.00. Williams explained the situation to Joana then discussed the transaction with Marie.

Joana, Jean Marie, and Marie then responded to an office in East Providence to sign the purchase and sales agreement to sell the Property to PPS. The following day, Joana executed the purchase and sales agreement to purchase the Property back from PPS. PPS then honored its obligations thereunder and allowed the Delvas to

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 9 of 56

continue to reside at the Property, without collecting rent, for the next year while Joana worked on getting a mortgage to purchase the Property back. *Id.* at p. 29, ln. 1-10.

Despite the efforts of Mr. Williams to assist Joana, she was not able to get financing. *Exhibit 12*, at p. 26, ln. 19-24. In July 2024, Seyboth listed the Property for sale. Upon discovering the listing, Sheila Delva confronted her parents and sister about the situation. Sheila then confronted Williams and Seyboth who explained what had occurred. Seyboth told Sheila that Williams approached him with the transaction and he offered to buy the Property for $100,000.00 and give Joana a year to buy it back before marketing it. Seyboth told Sheila that he had no knowledge of anything other than the simple transaction and was under the impression for the past year that everyone understood what was happening.

Sheila initially told Seyboth and Williams that her sister Joana was corrupt and scammed her parents out of the house for herself. However, the Delva's suddenly changed their collective tune in an effort to unwind the transaction that had been bargained for. The Delvas began to pretend that they could not read or speak English. The Delvas claimed that "the Defendants," without specifically identifying which Defendant, took advantage of their "lack of English proficiency" and told them that the purchase and sales agreements they signed were refinancing agreements.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-cr-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 10 of 56

Thankfully, through discovery, it is clear that the Delvas have lied and mislead everyone to get their house back at the expense of the personal and professional reputations of the Defendants, especially Messier and Seyboth. The Delvas knew exactly what was going on. The facts make it clear that Marie understands and reads English, that she chose not to read the documents before signing them, that she wrongfully assumed that she was signing a refinance agreement, that she misled her husband into thinking the same, and never told her Husband that she didn't read the documents. Similarly, Joana understood exactly what was going on and now appears to have remorse about the outcome and her failure to buy the house back. If anyone has "bilked" the Delva's it is the members of the family themselves. The facts make it abundantly clear that some combination of Joana and Marie were deceitful towards each other and Jean Marie in leading to this mess that they themselves created.

### Marie Delva

Marie Delva was deposed by the undersigned counsel on June 16, 2025. *Exhibit 1*. Marie stated that she moved to the United States in 1984. *Id.* at p. 19, ln. 1-7. She has lived in this country ever since. *Id.* at p. 19, ln. 16-17. She has the equivalency of a high school education in Haiti and successfully completed a certified nurse's assistant class in the United States. *Id.* at p. 20, ln 1-6; p. 21, ln. 1-10. Ms. Delva has been a CNA since 1999. To become a CNA, not only did she have to complete the required schooling, Marie also had to pass the CNA exam – a test

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-DK-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 11 of 56

administered in English. *Id.*, at p. 32, ln. 5-8. She was not assisted in taking the test by an interpreter. *Id.*, at p. 32, ln. 12-19.

Marie testified that she purchased her home in 1996 and had since refinanced the loan on the Property on at least two occasions. *Id.*, at p. 17, ln. 10-12; ln. 20-25; p. 18, ln. 1-21. Despite being familiar with hiring an attorney through her divorce from Jean Marie, she did not engage the assistance of an attorney in connection with this transaction. *Id.*, at p. 56, ln. 19-25; p. 57, ln. 19-25; p. 58, ln. 1-7. Although the Complaint alleges that the Delvas were facing foreclosure, Marie denied any memory that her house was in the foreclosure process or close to being lost. *Id.*, at p. 43, ln. 13-21.

Due to the allegations that Marie did not speak English, a Haitian Creole interpreter was requested. However, it became clear immediately, that the allegations in Marie's Affidavit and the Complaint that she could not speak English were false. Marie conversed freely in English with the doorman and receptionist upon her arrival. It was explained to Marie that she needed to wait for the interpreter to finish translating questions from English to Creole before answering. Despite that warning, Marie's charade was uncovered quickly. During the deposition, Marie repeated understood and answered questions in English without waiting for the translator. These instances included the following:

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-cv-10627   Doc 34-2   Filed 12/02/25   Entered 12/02/25 19:45:25   Desc
Exhibit B   Page 12 of 56

- When asked if she had ever been deposed before, Marie answered that she had not; *Id.* at p. 4, ln. 18-25.

- She stated in English, without the benefit of the translation, that she did not "speak English correctly."

- She admitted that she understood counsel's question about the deposition without need of a translator. *Id.* at p. 5, ln. 12-24.

- When asked if anyone translated the deposition notice for her, she answered "No, I didn't have nobody" without waiting for the translation. *Id.* at. p. 7, ln. 8-12, ln. 23-25.

- When asked who she discussed attending the deposition with, Marie stated, "my daughter" and "Sheila" without waiting for the translation. She was then asked to repeat her answer, she did so, again without waiting for the translation of the request to repeat her answer. *Id.* at p. 8, ln. 4-11; ln. 14-18.

- Marie was asked when she first refinanced her home, she responded that she did not remember without waiting for the translation. *Id.,* at p. 17, ln. 20-25; p. 18, ln. 1-8.

- At that point, Marie then stated, "I can understand English, but I cannot find words to express myself in English." *Id.,* at p. 18, ln. 20-23.

11

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-cv-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 13 of 56

- When asked where she went to school to become a CNA, Marie answered "I don't remember the address" without the benefit of the translation of the question. *Id.*, at p. 21, ln. 1-10.

- When asked where she went to school in Rhode Island, she answered in English. *Id.*, at p. 29, ln. 12-22.

- When she was asked if she knew that the Property was going to potentially be foreclosed on, Marie stated "No" without having the question translated. *Id.*, at p. 33, ln. 23-25; p. 34, ln. 1-3.

- At one point, Marie interrupted the interpreter to correct her English translation of an answer Marie had given in Creole stating that the translation of her answer was not accurate. *Id.*, at p. 35, ln. 6-21.

- When asked if she ever met Mr. Messier in person, she shook her head indicating "no" without waiting for the translation of the question. *Id.*, at p. 54, ln. 8-21.

- When confronted with a purchase and sales agreement in which PPS agreed to sell the Property back to Joana, Marie was asked to identify who was listed as the "buyer" on the document. She was able to read the word "buyer" on her own and locate it on the document. *Id.*, at p. 65, ln. 14-25.

Much of the deposition focused on disproving the fallacy that Marie cannot speak or read English enough to understand the nature of the transaction at issue in

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 14 of 56

this case.  In the Complaint, the Plaintiffs allege that Marie "could not understand" the purchase and sales agreements and closing documents in the case. The Complaint alleges that the Defendants took advantage of her "limited English proficiency." In her own affidavit, Marie stated, under oath, that she "struggle[s] to communicate in English" and that she believed that "they deliberately targeted us because of our limited English proficiency and country of ancestral origin." *Exhibit 2*, ¶ 2, 12, and 15. Thanks to the deposition, all of this is proven utterly false.

By her own reluctant admission, Marie Delva speaks and reads English. Throughout her deposition, she admitted that she could read English. First, she stated that she could read "basic" words. When asked if she could read words such as "sell", "buy", and "refinance", Marie acknowledged that those were "basic" words that she could read. *Exhibit 1*, at p. 24, ln. 10-25; p. 25, ln. 1-5. She explained that she knew how to read "buy" from when she purchased her house. *Id.* Marie also admitted that she knew what a "deed" was and could read the word "D-E-E-D" if presented with it. *Id.* at p. 25, ln. 13-25; p. 26, ln.1-4. She stated that she read the deed when she purchased her house because "it was an important document, so I read it and I signed it and brought it back." *Id.*

Marie also acknowledged having to learn to speak and read English in connection with her employment as a CNA for the last 26 years. Marie stated that her CNA instructor was Haitian and helped her to learn to speak and read in English.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 15 of 56

*Id.* at p. 33, ln. 1-11. She took the CNA exam in English. *Id.* at p. 32, ln. 5-8. She stated that she understood enough English, even back in 1999, to pass the test. *Id.* at p. 32, ln. 12-19; p. 33, ln. 1-11.

During the deposition, Marie was clearly trying to pretend that she could not read simple sentences. That lie was quickly dispensed with. In fact, Marie even acknowledged that when she was asked if she could read paragraph 7 of her affidavit, she lied and said she could not when in reality she could and did read it in the deposition. *Id.* at p. 40, ln. 22-25; p. 41, ln. 1-6. When held accountable for her lies in the deposition, Marie was able to read her affidavit, the deed selling the Property to PPS, the purchase and sales agreement by which she conveyed the Property to PPS, and the purchase and sales agreement whereby PPS agreed to give Joana one year to buy the Property. *Id.* at p. 39, ln. 6-25; p. 40, ln. 1-17; p. 52, ln. 4-6; p. 65, ln. 14-25; p. 72, ln. 7-22. Marie read each of these documents without the assistance of the translator.

Marie stated that she did not have any firsthand recollection of her conversations with Thelma Howard or Lowell Williams, despite purportedly describing those conversations in her affidavit. *Id.* at p. 43, ln. 1-6; *Exhibit 2*. She stated she could not recall if Lowell Williams offered to help her prevent the foreclosure of the home. *Id.* Marie stated, unequivocally, that she did not discuss preventing the foreclosure of her home at all with Williams. *Id.* at p. 48, ln. 13-23.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 16 of 56

She stated that she never discussed any aspect of the transaction with Seyboth or Messier. *Id.* at p. 47, ln. 12-18. She denied knowing who they are or what they look like. Marie couldn't even recall if Lowell Williams had ever even mentioned Seyboth, Messier, or PPS to her. *Id.* at p. 48, ln. 1-6.

According to Marie's deposition testimony, all matters related to this transaction were discussed between Joana and Williams. *Id.* at p. 48, ln. 13-23. Marie never spoke directly to Mr. Williams, Seyboth, or Messier herself. *Id.* Marie maintained that it was her goal to refinance the mortgage on the house. Yet, she never told any Defendant, or Attorney Catarina, that was what she expected to be signing. She denied that Joana told her that PPS was going to buy the Property for $100,000.00 and give Joana a year to purchase it from them. *Id.*, at p. 49, ln. 4-10. She denied knowing that PPS was going to pay off the defaulted mortgage to save the Property from foreclosure. *Id.* However, Marie's deposition testimony and affidavit are inconsistent with her statements on the calls recorded by Sheila.

Marie's feigned ignorance is proven a lie by the transcript of the calls recorded by Sheila. From July 3 through July 5th, Sheila recorded a number of calls between her, Seyboth, Williams, and Joana. During the July 5th call, Sheila was present with Marie at the Property while she was recording the call with Seyboth and Williams. Knowing she was being recorded, Marie described the transaction related to the Property. Despite her insistence in her affidavit and deposition that she believed that

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 17 of 56

the Property was going to be refinanced and not sold to PPS or Joana, the recorded calls exposes the truth that Marie Delva understood the basic elements of the transaction. The transcript reads as follows:

| Marie Delva: | "So, we go all- we sign, me and Joana sign, and they want Papi (inaudible). Papi stay with the kids. So the next time we go in, them said, "No, you can't sign for him. He have to come sign. And Papi sign too." |
| Sheila Delva: | "What's the paper for?" |
| Marie Delva: | "The agreement for the house." |
| Sheila Delva: | "Agreement for what?" |
| Marie Delva: | "Because them said they're going to pass the house to Joana to sell to Joana and – before she got a job. When we do that, she got a job. So, them said they're going to pass the house to Joana." *Exhibit 3*, p. 22, ln. 17-21; p. 23, ln. 10-12; p. 23, ln. 13-15; p. 23, ln. 21-25; p. 24, ln. 1. |

Not only does Marie describe the transaction, that the foreclosure would be avoided and Joana would have an opportunity to purchase the house back, she does so in English. *Id.* There is no discussion of refinancing to keep the house in Marie's statement on the recording. The only discussion is that to avoid foreclosure, PPS was agreeing to give Joana an opportunity to buy the house back from them in one year.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 18 of 56

Marie Delva's credibility is further damaged when examining this statement against her affidavit in which she makes no mentioned of a conveyance to Joana. *Exhibit 2*.

In the deposition, Marie was confronted with the purchase and sales agreement that the Delvas executed to transfer the Property to PPS for $100,000.00. *Exhibit 4*. Without even looking at the document when it was handed to her, Marie quickly stated "I didn't read the document, and I saw this page that just showed me my signature. Once again, I didn't sign any document to sell my house." *Id.*, at p. 50, ln. 15-20. Marie admitted that she could have understood the purchase and sales agreement if she bothered to read it, but she did not attempt to read a "single word" before signing. *Id.*, at p. 51, ln. 1-25; p. 52, ln. 4-6. She acknowledged her own negligence by admitting that if she had read the document and saw that it had called for her to sell her house to PPS for $100,000.00 she would not have signed it. *Id.,* at p. 61, ln. 9-14; p. 88, ln. 25; p. 89, ln. 1-3.

The purchaser and sales agreement was not the only document that Marie signed in this case without reading it. When shown her affidavit, Marie stated that she signed it but never read it. *Exhibit 2*; *Exhibit 1*; p. 36, ln. 7-12; p. 37, ln. 2-8. She also admitted that she did not read the certification presented to her at closing in which she acknowledged that attorney Catarina had explained each document to her before she signed it. *Id.*, at p. 80, ln. 19-25; p. 81, ln. 1-5; ln. 17-25. Critically, Ms. Delva stated that she did even bother to read the deed before she signed the title

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 19 of 56

conveying the Property to PPS. *Exhibit 5*; *Exhibit 1*, p. 75, ln. 1-14. She said she did not have time to read the documents. *Id*. When asked why she didn't ask for time to review the documents, she stated, "I couldn't ask for more time because for me, in my knowledge, I was signing a document for refinancing." *Id.*

When she was shown the deed that she didn't bother to read before signing in the deposition, Marie clearly could see and understand that the deed was executed by her and conveyed title to PPS. *Id.*, at p. 72, ln. 7-22. She denied any memory of signing the deed. *Id.*, at p. 73, ln. 1-15. She could not recall anything about the closing except receiving her check for $40,000.00. *Id*. She stated that she did not recall ever telling anyone that she didn't understand or needed time to consider the matter. Despite her lack of memory on other points, Marie did state that she remembered that "my ex-husband asked to have an interpreter, but they didn't provide one…but I don't remember how he said that in English." *Id.*, at p. 76, ln. 25; p. 77, ln. 12-22. When challenged how her husband could have requested an interpreter if he did speak sufficient English to do so, Marie responded that "I didn't pay attention to that." When asked if she told the Plaintiffs that she "didn't pay attention to all of these details" when she filed her complaint with them, Marie admitted that she did not. *Id.*, at p. 77, ln. 23-25; p. 78, ln. 1-11.

In addition to not reading any of the documents before she signed them, Marie admitted that she never told anyone at the closing table that neither she nor her

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-DK-10627     Doc 34-2     Filed 12/02/25     Entered 12/02/25 19:45:25     Desc
Exhibit B     Page 20 of 56

husband understood the documents or what was transpiring. *Id.* at p. 62, ln. 1-5; p. 76, ln. 8-20. She could not recall if Catarina did or did not explain each document despite signing a certification that he did. *Id.* Marie stated that, "they gave me a the document to sign and I just signed it." While she tried to excuse her negligence by saying "they rushed me," Ms. Delva admits that "they" did not include Seyboth or Messier. *Id.*, at p. 53, ln. 1-4; ln. 13-24; p. 54, ln. 8-21.

The deposition also unraveled the idea that Marie Delva was misled by PPS, Seyboth, and Messier into thinking that she was refinancing the mortgage on her house. In her deposition, Marie admitted that none of the Defendants ever told her that she would be refinancing the mortgage through executing the documents involved in the transaction. *Id.*, at p. 60, ln. 3-23. Additionally, Marie testified that her daughter Joana, who had been designated to deal with Mr. Williams, hadn't even told her that she was refinancing the house. *Id.* In fact, Marie admitted that she just "assumed" that she was signing a refinancing agreement. *Id.* Again, this assumption was made without bothering to read the documents, listening to the explanation of Attorney Catarina, or asking any clarifying questions.

Marie also acknowledged that it was *her* own negligence that misled her husband into believing that he was refinancing the mortgage rather than selling the Property, not any action of the Defendants. *Id.*, at p. 59, ln. 1-23. Marie acknowledged that she was the only person who told Jean Marie Delva that he was

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 21 of 56

signing papers to refinance the mortgage. *Id.* She knew he could not read English well enough to know what he was signing, yet she did not tell anyone else involved in the closing. *Id.* She acknowledged that her husband had never had a direct conversation about the transaction with Mr. Williams or any of the Defendants and received all his information through her. *Id.* In fact, she stated that she never even spoke with any of the Defendants directly. *Id.*, at p. 48, ln. 13-23. Marie stated that she got all her information from Joana. *Id.* She admitted that she told her husband to sign the documents, misleading him to believe it was a refinancing agreement, without ever reading the documents herself, something she acknowledges that she would have been able to understand on her own if she bothered to read. *Id.*, at p. 60, ln. 3-23; p. 61, ln. 9-14. Critically, Marie admitted that she never told her husband that she just assumed, without reading, that the documents were for a refinance. *Id.*, at p. 86, ln. 18-25; p. 87, ln. 1-25.

While no interpreter may have been present because none was requested, Marie stated that her daughter, Joana, who she had tasked with working things out with Mr. Williams, was present during the signing of the purchase and sales agreement and the closing. *Id.*, at p. 1-13. Joana was born, raised, and educated in the United States. *Id.*, at p. 46, ln. 1-15. Despite swearing in her affidavit that she in fact spoke Haitian Creole, Marie says Joana does not speak Creole. *Id.*, at p. 44, ln. 1-7. *Exhibit 6.* Marie stated that she did not ask Joana any questions about the

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 22 of 56

documents prior to signing any of them. *Id.*. Marie testified that Joana did not make any representations about the contents of the documents, either that it was a sales agreement or a refinance agreement before Marie and Jean Marie executed the documents.

Despite her statements during the record July 5, 2023 telephone call, Marie testified that she was unaware that Joana had reached an agreement to buy back the Property from PPS the day after the purchase and sales agreement with the Delvas to sell the Property to PPS was executed. *Id.*, at p. 62, ln. 18-22; *Exhibit 7*. When shown the purchase and sales agreement that expressly gave Joana the right to purchase the Property from PPS for a period of one year, Marie stated that she had never seen the document. *Id.*, at p. 63, ln. 16-20. Her daughter never told her she had signed such an agreement, nor that she had negotiated the same with PPS. *Id.*, at p. 65, ln. 14-25; p. 66, ln. 1-5. She stated that upon seeing what her daughter had done, she was surprised because she didn't discuss a sale with Joana, only "about the finance situation." *Id.*, at p. 66, ln. 7-14; p. 68, ln. 6-18.

**Joana Delva**

Joana Delva is one of the Delvas' children. As discussed above, she was charged by Marie with working out a deal with Mr. Williams to prevent the foreclosure of the home. Joana is very much at the center of this storm and, if anyone deceived the Delvas, it was Joana herself either intentionally or through her own

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 23 of 56

negligence. At the time of the transaction, Joana was residing with her parents at the Property. She testified that she did leave the house from August 24 through February 2025 "because of the Property situation." *Exhibit 8,* at p. 10, ln 20-25; p. 11, ln. 1-4. Joana stated that her parents are divorced but continue to live together "for the needs of survival." *Id.* Joana is a high school graduate and attended the Lincoln Technical Institute. *Id.*, at p. 25, ln. 4-14.

Joana testified clearly that Marie "understands English to know what selling a house is…" *Id.*, at p. 22, ln. 16-18. She says that despite her mother stating that she wanted to do a "reverse mortgage," her mother doesn't even know what a reverse mortgage is. *Id.*, at p. 23, ln. 17-25; p. 24, ln. 1-3. Joana testified that she first became involved with the transaction after Marie told her that a real estate agent named Thelma Howard had come to the house and spoken with her. *Id.*, at p. 27, ln. 11-15. Joana stated that Thelma did not state she wanted to list the house for sale, rather that Thelma was aware that the Delvas wanted to avoid foreclosure and stated that Lowell Williams may be able to help. *Id.*, at p. 28, ln. 10-19; p. 29, ln. 16-21. Joana said no representations were made that Lowell Williams was a real estate agent. *Id.* Thelma made no mention of PPS, Seyboth, Red Balloon Capital, The Seyboth Team, Century 21, or Messier. *Id.*, at p. 30, ln. 2-16.

When Joana met Lowell Williams she indicated that he made no mention of Seyboth, only that Thelma had sent him to speak with the Delvas. *Id.*, at p. 36, ln. 1-

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case Number: PC-2024-05896    1:25-DR-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 24 of 56

6. Joana never met Seyboth or Messier prior to the closing. *Id.* at p. 37, ln. 22-25; p. 38, ln. 1-2. She never negotiated any aspect of this transaction directly with Seyboth or Messier. *Id.*, at p. 40, ln. 2-15. The only person she dealt with was Lowell Williams.

After a series of discussions between Joana and Williams, it was agreed that the Delvas would sell the Property to PPS and Joana would be afforded one year to purchase it back. If she couldn't, PPS would retain possession. *Id.*, at p. 38, ln. 3-15. To avoid foreclosure, PPS would pay off the mortgage and her parents would take the remaining balance of the purchase price of $100,000.00.

During the deposition, Joana was shown the purchase and sales agreement conveying the Property to PPS for $100,000.00. *Exhibit 4.* After examining the document, she could clearly see and understand that it was a purchase and sales agreement. *Exhibit 8*, at p. 41, ln. 19-24. She stated that she reviewed the document and "tried to understand it." She claimed not to understand "the vocab" within the following sentence, "The buyer agrees to pay the seller the purchase price for the property of the amount of $100,000.00." *Id.*, at p. 42, ln. 1-19. However, Joana was clearly being dishonest about not understanding that sentence because she then later testified when looking at her purchase agreement that she understood the exact same sentence when the terms conveyed the Property to her. *Id.*, at p. 51, ln. 20-25; p. 52,

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-br-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 25 of 56

ln. 1-2. She acknowledged that she understood what it was to "sell" a property as it was written in the document. *Id.*, at p. 42, ln. 1-19.

Joana identified the seller's signatures as those of her parents. *Id.*, at p. 43, ln. 3-24. Joana testified that she was present when her parents executed the purchase and sales agreement. She stated that the Delvas were able to ask questions about the documents but didn't despite their alleged confusion as to the language conveying the Property to PPS. She stated, "I still thought that this was part of the plan that Lowell had in place…" *Id.* When pressed as to why she would not have objected to the document when she clearly read that it was going to convey the Property to PPS for $100,000.00, she stated she didn't know. *Id.*, at p. 45, ln. 2-15. When asked if she explained the document to her parents, she stated that "I tried my very best to explain to them that whatever me and Lowell talked about, that they would be okay." *Id.*, at p. 46, ln. 1-5. She admitted that despite her reading the agreement before they signed it and knowing that it was a sales agreement, she never told her parents that they were signing a purchase and sales agreement. *Id.*, at p. 47, ln. 3-20. When asked why she wouldn't have told her parents the truth, she stated that she "ignored" the title of the document that clearly identified it as a sales agreement. *Id.*, at p. 48, ln. 15-25; p. 49, ln. 1.

Joana stated that she allegedly told the attorney at the closing that her parents did not understand English and needed an interpreter. *Id.*, at p. 50, ln. 2-23. She

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 26 of 56

claims, outrageously, that Attorney Catarina ignored her requested and forced the closing anyway. *Id.*, at p. 50, ln. 2-23. She stated that neither Seyboth nor Messier were ever present during the execution of the documents. *Id.*, at. p. 51, ln. 7-11.

Joana was also shown the purchase agreement that she executed on June 29, 2023 providing her until July 1, 2024 to buy the Property from PPS. *Id.*, at p. 51, ln. 20-23; p. 52, ln. 8-18; *Exhibit 7*. She stated that Jean Marie was present with her when she signed the agreement to buy the house within one year. *Id.* at p. 54, ln. 8-21. When asked if she understood the document, she stated that she did and accurately described its contents. *Id.* at p. 55, ln. 12-24.

Joana was then shown the deed conveying the Property to PPS. She stated that she attended the closing with her parents but was not "familiar" with the deed her parents signed. *Id.*, at p. 58, ln. 4-24; *Exhibit 5*. She stated she was with her parents when Attorney Catarina presented the documents, including the deed, and when they signed them. *Id.* She alleges that Attorney Catarina did not explain any of the documents to her or her parents, but admits that no one asked any questions. *Id.* at p. 59, ln. 16-23. However, she also admitted, that she did not tell Catarina that she was unable to translate for her parents or ask him to provide a translator for them. *Id.*, at p. 72, ln. 1-18.

Joana claimed to not have understood that they were there to close the sale of house. However, when pressed she acknowledged that at the time of the closing she

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-DK-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 27 of 56

had already signed a purchase agreement to buy the house from PPS and that obviously PPS could not sell her a house unless they owned it. *Id.*, at p. 60, ln. 1-22. She admitted that she never told Catarina at the closing that she and her parents did not understand the consequences of signing the deed. *Id.*, at. p. 99, ln. 1-15. She acknowledged that she was the only one in the room at the closing who knew for certain whether her parents understood what was happening but never informed the attorney of any concerns. *Id.*, at p. 100, ln. 3-24.

Incredibly, despite simultaneously claiming that no one knew what was happening and that Catarina did not explain the documents to her parents, Joana contends that during the closing her parents directly told Catarina that they did not want to sell the Property to PPS. *Id.* at p. 63, ln. 2-23; p. 64, ln. 3-9. She claims Catarina again ignored their protest. Realizing that her claims made no sense, Joana was then forced to acknowledge that in order to protest the sale in the closing, obviously her parents had to understand that what they were signing was going to sell their Property to PPS. She stated that despite knowing they were selling the house, Jean Marie and Marie signed the deed anyway. *Id.* at p. 64, ln. 13-23. Joana stated that she did not intercede to stop her parents from allegedly selling their home unwillingly in her presence because it was "inconvenient" for her "because of work, and I couldn't keep calling out of work or rescheduling to—yeah." *Id.*, at p. 72, ln. 24-25; p. 73, ln. 1-5. Critically, neither Seyboth nor Messier were present for any of

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 28 of 56

these alleged actions. *Id.* She admitted that she took no action to stop the closing. *Id.*, at p. 65, ln. 16-22.

Following the closing, Joana acknowledged that PPS afforded her the agreed upon time to try to secure financing to buy the Property. She stated that despite her best efforts, she was able to do so because of issues with credit and an inability to maintain employment. She stated that none of her siblings would co-sign with her. *Id.*, at p. 97, ln. 10-24.She stated that Lowell tried to help her with finding a job and getting a mortgage but it was to no avail. She acknowledged that once she was in contact with Mr. Seyboth he agreed to wait for her to try to figure things out but ultimately she couldn't do so. *Id.*, at p. 87, ln. 4-14.

Joana lays responsibility for these circumstances at her feet and on Mr. Williams, not PPS, Seyboth, Messier or the other Defendants. She stated, "I never did any of this purposely. I would say I was a fool." *Id.*, at p. 91, ln. 1-21; 92, ln. 2-24. She stated that she does not allege that Messier or Seyboth were dishonest. She feels that Mr. Williams is the only Defendant to blame. *Id.* She admitted that she never expressed any objection or told Mr. Williams, the only person she had been in contact with, that she did not understand what was happening until her sister Sheila got in involved when Seyboth began showing the house. *Id.*, at p. 93, ln. 21; p. 94, ln. 1-2.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-cv-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 29 of 56

Once again there is a lack of truthfulness as to what Marie knew about the transaction and when. As stated previously, Marie stated that she was unaware that Joana was contracted to buy the house from PPS but failed to do so. In her deposition, Joana made the same claim, i.e., that Marie did not know that Joana was going to be the one in the family to purchase back the Property. *Id.*, 95, ln. 15-20. She stated, that she was "100 percent sure" that her mother had no knowledge. She stated that she simply "tried to briefly explain to her that the house was supposed to be put in my name." *Id.* at p. 95, ln. 20-24; p. 96, ln. 1-19

Joana admitted that PPS, Seyboth, and Messier were in the dark as to whether the Delvas understood what was happening. She never told anyone that there was a misunderstanding or miscommunication. She even pretended to have a lawyer assisting her in the transaction. Without that information, she acknowledged that PPS could have possibly been aware when it paid $100,000.00 to purchase the Property that there was anything other than a mutual agreement between the parties thereto. *Id.*, at p. 100, ln. 3-24; p. 101, ln. 1-6; p. 102, ln. 1-11.

**Sheila Delva**

Sheila Delva is another Delva daughter but was not involved in any of the lead up to the sale of the Property to PPS and has no firsthand knowledge of any of the discussions between Williams, Marie, and Joana. However, she has been deeply involved in pushing her mother and sister to provide false affidavits and testimony

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 30 of 56

feigning confusion and ignorance as to this mutually agreeable arm's length transaction. Sheila became involved when her older sister made he aware that the Property was listed online for sale. She confronted Marie about it and Marie lied and said she was unaware of the sale of the house. In response, Sheila contacted Mr. Seyboth since he was listed as the broker.

Mr. Seyboth explained that Mr. Williams approached him and asked him if he would be interested in purchasing the home. Mr. Seyboth said he told Mr. Williams he would be willing to purchase the home for $100,000.00.  Mr. Seyboth then agreed to hold the Property for a year so that Joana could buy the house back. Sheila recorded a series of calls with Seyboth and Williams on July 3rd and July 5th of 2024. As previously discussed, Marie is on the July 5 recording clearly demonstrating her own knowledge that the plan was for them to sell the house and for Joana to put it into her name to avoid foreclosure.

On the July 5th calls, Sheila makes it clear that she believed that Joana and her boyfriend had scammed her parents. Sheila said that Joana was corrupt and ran off to "hide" after she exposed what Joana had done with the Delva's house. *Exhibit 3*, at p. 21, ln. 21-24; p. 71, ln. 7-10. She claimed that Joana lied to her parents to get the house into her name. *Exhibit 9*, at p. 54, ln. 15-22. On the calls, Sheila clearly stated the Seyboth had done nothing wrong and that it was Joana who had deceived her parents without the Defendant's knowledge. *Exhibit 3*, at p. 71.

29

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 31 of 56

However, in the wake of a highly publicized lawsuit, and to try to gain the house back, Sheila changed her story substantially and lacks credibility before this court. When asked why she called her sister a scammer if she didn't believe she did anything wrong, Sheila responded "I called everyone a scammer." *Exhibit 10*, at p. 32, ln. 5-10. She said that she now knows her sister has clean hands in this situation simply because "she's my sister.." *Id.*, at p. 36, ln. 11-22. She also said that she has a tendency to "say a lot of things" that are not true when she is "mad." *Id.*, at p. 39, ln. 1-12. She admitted that she often speaks without full knowledge of the facts. *Id.*, at p. 56, ln. 2-16.

Sheila acknowledges that her Marie admitted on the call that she knew what Joana had arranged with Mr. Williams. *Id.*, at p. 43, ln. 23-25; p. 44, ln. 1-3. She stated that Jean Marie understands enough English to understand the words "buy" and "sell." She testified that her mother is able to read English. *Id.*, at p. 16, ln. 1-15. Sheila was specifically asked, "Your mother understands enough English if an attorney put [a purchase and sales agreement] in front of her and said, 'By signing this document, you're selling your property to the buyer for $100,000,' she understands enough English to know what that means, right?" In response, Sheila stated that "she understands that" but claimed that Attorney Catarina never told her parents what they were signing. *Id.*, at p. 21, ln. 1-13.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 32 of 56

Sheila testified that she even asked her mother why she signed the papers. She testified that she asked her mother "why she didn't read it? You know, she could see it says 'sell'." According to Sheila's testimony, Marie told her she didn't read the documents before signing because she was "too tired." *Id.*, at p. 22, ln. 12-19. Sheila acknowledged that her mother and father never told anyone in connection with the documents that they didn't understand what they were signing. *Id.*, at p. 22, ln. 23-24; p. 23, ln. 2; ln. 7-9. She acknowledged that unless someone informed Attorney Catarina of a lack of understanding of the documents, he would have had no way of knowing the same. *Id.*, at p. 23, ln. 14-23.

Sheila's testimony confirmed that Seyboth was not involved in any of the negotiations leading up to the purchase of the Property by PPS. *Id.*, at p. 25, ln 14-16. She claims that Joana never explained to anyone in the family that she had signed a contract to purchase the house back from PPS. *Id.*, at p. 27, ln. 2-18; p. 30, ln. 16-24.

**Attorney Louis Catarina**

The Plaintiffs conducted a deposition of Attorney Catarina on April 25, 2025. *Exhibit 11*. Attorney Catarina testified that he has never notarized a document for a person who indicated that they did not speak English without the assistance of a translator. *Id.*, at p. 9, ln. 20-22. He indicated that he conducted the closing of the Property. He stated that Joana, Marie, and Jean Marie were all present. He stated that

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 33 of 56

no one in the Delva family ever requested a translator, told him that they didn't understand what was happening, or objected to the proceedings. *Id.*, at p. 15, ln. 6-21. He said the only question the Delvas asked was when they could pick up their check. *Id.*, at p. 16, ln. 15-25; p. 17, ln. 1.

Attorney Catarina testified that he spoke English in the closing to the Delvas and did not have any indications that they did not understand. He asked them for items and gave them directions that they understood and complied with. *Id.*, at p. 21, ln. 6-11. He testified that even amongst themselves, the only language spoken in the closing by the Delvas was English. *Id.*, at p. 21, ln. 13-24. He testified that the Delvas were scheduled to receive $40,000.00 in net proceeds at the sale and that his office wrote a check to them for that amount.

Attorney Catarina testified that in his normal course he explains each document to the sellers before they sign. He had no recollection of deviating from that normal process in relation to this closing. He stated that at the end of the closing, the Delvas all seemed "genuine[ly]" happy with the outcome. *Id.*, at p. 20, ln. 23-25; p. 21, ln. 1-5; p. 29, ln. 11-15; p. 33ln. 21-25.

## LEGAL STANDARD

In determining whether to grant a preliminary injunction, the Court should consider and resolve "each of the appropriate preliminary-injunction factors without

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-BK-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 34 of 56

abusing [its] discretion in doing so." *DiDonato v. Kennedy*, 822 A.2d 179, 181 (R.I.

2003). Accordingly, the Court should determine whether the moving party:

> (1) has a reasonable likelihood of success on the merits, (2) will suffer
> irreparable harm without the requested injunctive relief, (3) the balance
> of the equities, including the possible hardships to each party and to the
> public interest, tip in its favor, and (4) has shown that the issuance of a
> preliminary injunction will preserve the status quo.

*Id.* (citing *Iggy's Doughboys, Inc. v. Giroux*, 729 A.2d 701, 705 (R.I. 1999).

In determining the reasonable likelihood of success on the merits, the Court

does not require the moving party to establish "a certainty of success[;]" rather, the

Court requires only that "[the moving party] make out a prima facie case." *Id.*

Additionally, in considering the equities, the Court should bear in mind that

> [T]he office of a preliminary injunction is not ordinarily to achieve a
> final and formal determination of the rights of the parties or of the
> merits of the controversy, but is merely to hold matters approximately
> in status quo, and in the meantime to prevent the doing of any acts
> whereby the rights in question may be irreparably injured or
> endangered.

*Id.* (quoting *Coolbeth v. Berberian*, 112 R.I. 558, 564, 313 A.2d 656, 659 (1974)).

In Plaintiffs' Memorandum, Plaintiffs have urged this Court to dispense with

the requirement that irreparable harm be established prior to the issuance of a

preliminary injunction. Plaintiffs urge the Court to take this position because

irreparable harm cannot be established. The Plaintiffs seek to recoup alleged

"equity" that the Delvas have missed out on by selling their house to PPS to avoid

foreclosure. The Plaintiffs do not seek to return the Property to the Delvas to

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-br-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 35 of 56

maintain the sentimental value of their home. This case is about money, plain and simple. The Delvas sold a house they now contend is worth $450,000.00 to PPS for $100,000.00, sight unseen. Had they not sold the home, the Delvas would have lost it to foreclosure, along with all of the "equity" associated therewith. Our Supreme Court has been clear, when money damages are available, irreparable harm cannot be established. *In re State Employees Union*, 587 A.2d 919, 926 (R.I. 1991).

There is no Supreme Court precedent to sanction relieving the Plaintiffs from meeting the standard requirements of a preliminary injunction. The Supreme Court has held that "in limited instances, courts have recognized that, by statute, the Legislature may abrogate the irreparable-harm requirement." *R.I. Turnpike & Bridge Authority v. Cohen*, 433 A.2d 179, 182 n5 (R.I.1981). There has been no such abrogation by the General Assembly in the DTPA.  R.I.Gen.Laws §6-13.1-5(a) authorizes the Plaintiffs to seek injunctive relief to enjoin "the use of [any] method, act, or practice" in violation of the DTPA. The statute does not expressly make any reference to the Plaintiffs not having to meet the traditional standards associated with obtaining that injunctive relief. Therefore, pursuant to *R.I. Turnbike & Bridge Authority*, the DTPA does not qualify as a "limited" instance where irreparable harm needn't be established prior to this Court granting a preliminary injunction.

In seeking to persuade this Court to ignore the general rule for injunctive relief, the Plaintiffs rely on nonbinding authority in the form of a decision of

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 36 of 56

Associate Justice Stern in *Neronha v. Prospect Medical Holdings, Inc.*, No. PC-2023-05832, 2024 WL 3058329, at *10 (R.I.Super. June 12, 2024). However, the case is clearly distinguishable. In *Prospect*, the matter had already be decided on its merits administratively and the Defendants admitted to being in violation of an existing order from the Attorney General pursuant to the Hospital Conversion Act. Only after making a finding that the General Assembly abrogated the irreparable harm requirement specifically through the Hospital Conversions Act did Justice Stern relieve the Attorney General of the irreparable harm requirement because it expressly authorized the Attorney General to "seek immediate relief in the superior court to enforce the conditions of approval of a conversion." *Id.* at *10. Thus, by virtue of the statute authorizing "immediate relief" to enforce a condition of a decision of the Attorney General related to a conversion, Judge Stern concluded that there was no requirement of meeting the irreparable harm standard. The Plaintiffs had a unique interest in enforcing its order in *Prospect* under the Hospital Conversion Act with no other remedy at law to do so. Such is not the case in this matter.

R.I.Gen.Laws §6-13.1-5 does not authorize the Plaintiffs to "seek immediate relief in the superior court" related to an *alleged* violation of the DTPA. Rather, the Attorney General is only authorized to "bring an action in the name of the state against the person to retrain by temporary or permanent injunction the use, method,

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 37 of 56

act, or practice, upon the giving of appropriate notice…" This statute is in stark contrast to the Hospital Conversion Act which authorized "immediate relief." There is nothing in the DTPA that would justify this Court from not holding the Plaintiffs to the usual standards unlike in *Prospect* where the statute authorized immediate relief to compel adherence to an order that had already issued approving a conversion on its merits. Here, the underlying case has not been so adjudicated and all that exists are allegations.

This Court should apply the traditional legal standard for injunctive relief in this matter as laid out in *DiDonato*. 822 A.2d at 181.

## ARGUMENT

I.    **The DTPA does not apply to the transaction between the Delvas and PPS and thus this Motion must be denied as a matter of law.**

In order for the DTPA to apply and standing to exist for suit to be filed, "a plaintiff must establish that he or she is a consumer, and that the defendant is committing or has committed an unfair or deceptive act while engaged in a business of trade or commerce." *Kelley v. Cowesett Hills Associates*, 768 A.2d 425, 431 (R.I. 2001). The Plaintiffs are not consumers under the DTPA. The Plaintiffs bring the suit on behalf of the state to vindicate the false presumption that the Delvas have been wronged by the Defendants, but specific to this Motion, by PPS. In order for the Plaintiffs to have standing to bring this action and this Motion, the DTPA has to apply to the transaction between the Delvas and PPS.

*See* R.I.Gen.Laws §6-13.1-5. R.I.Gen.Laws §6-13.1-5 limits the Plaintiffs ability to bring suit to only situations where there is a violation of R.I.Gen.Laws §6-13.1-2. The only way for there to be a violation of R.I.Gen.Laws §6-13.1-2 is for the Delvas to be consumers and for PPS to have committed an unfair or deceptive act while engaged in business of trade or commerce. *Kelley*, 768 at 431.

The Delvas are not consumers in the transaction in question as it relates to PPS and PPS has not engaged in trade or commerce in relation to the Delvas as defined in R.I.Gen.Laws §6-13.1-2(5). The DTPA does not define a consumer. However, consumer is a simple term which can be understood through its common dictionary definition. According to *Oxford's Dictionary*, a consumer is one who "buys goods or uses services." Clearly, the Delvas have not purchased anything from PPS nor have PPS provided the Delvas with any service that the Delvas paid them for performing. In fact, it was PPS that was the consumer in the transaction since PPS paid the Delvas $100,000.00 to purchase the Property. As such, the DTPA does not apply and this Motion must be denied as there can be no chance of success on the Complaint as it relates the allegations against PPS.

Even if the Delvas are somehow defined as consumers, PPS has not engaged in "trade" or "commerce" as is defined in the DTPA. R.I.Gen.Laws §6-13.1-5(5) defines "trade" and "commerce" as the "advertising, *offering for sale, sale,* or distribution of any services and any property, tangible or intangible, real,

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-DR-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 39 of 56

personal, or mixed, and any other article, commodity, or thing of value whatever situate, and include any trade or commerce directly or indirectly affecting the people of this state" [emphasis added]. It is irrefutable that PPS has not engaged in any of the statutory conduct which triggers the application of the DTPA. PPS *purchased* real property from the Delvas. That property was offered for sale *by the Delvas*. By the clear definitions in the statute itself, the Delvas are not consumers vis-à-vis PPS, and PPS did not engage in trade or commerce by *purchasing* real property offered to them. As such, the DTPA does not apply and this Motion must be denied.

## II.     The Plaintiffs cannot establish a likelihood of success on the merits in the face of the clear evidence in this case.

The Plaintiffs have not only failed to establish a likelihood of success on the merits of its Complaint, but it is also clear that the allegations in the Complaint are largely disproven by the testimony of the Delvas themselves. The evidence shows that Joana and Marie Delva knowingly negotiated the transaction to sell the Property to PPS for $100,000.00, provided that Joana would have one year to repurchase the Property for $280,000.00. *Exhibit 4; Exhibit 7*. The evidence shows that not a single Defendant represented to any of the Delvas that they were signing documents to refinance their mortgage. The evidence shows that it was the negligence of Marie Delva in failing to read documents, that she acknowledges she could have understood if she had read, that led to any level of alleged confusion on their part.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-CR-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 40 of 56

Further it is uncontroverted that Marie Delva "assumed" that she was signing a refinance and that she herself was the only person who told Jean Marie that that is what he was signing. To top it off, she admits that she told her husband this false information without bothering to tell him that she had not even attempted to read the documents beforehand. The Delvas have duped the Plaintiffs into filing a false, scurrilous and sanctionable Complaint against PPS, Seyboth, and Messier and they cannot prevail on their Motion.

At this point in the case, the facts described at great length in this Memorandum have established that the shotgun Complaint's allegations in ¶¶2, 3, 7, 23, 26, 27, 31, 32, 38, 39, 43, 48, 49, 50, 53, 55, 56, 57, 60, 63, 64, 65, 66, 69, 71, 74 and 75 are all either completely false or completely lacking in any evidentiary support as it related to Seyboth, Messier, and PPS.[3] The Plaintiffs have built this fabricated case on a core allegation that the Defendants, and for purposes of this Motion PPS, Seyboth, and Messier, (1) took advantage of people who did not speak or read English, (2) represented to them that they would refinance their mortgage, (3) committed a bait and switch in the presence of an attorney by giving them purchase and sales agreements instead of loan documents, (4) with the intent to deceive the Delvas into selling them their house. As this Court can already see from the lengthy summary

---

[3] Reference is made to the corresponding paragraphs in the Complaint for the sake of brevity. To restate them each individual would render this already lengthy Memorandum even longer.

39

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627     Doc 34-2     Filed 12/02/25     Entered 12/02/25 19:45:25     Desc
Exhibit B     Page 41 of 56

of the deposition testimony, each aspect of the foundation upon which the Complaint rests is false.

A trade practice can be deemed deceptive if the alleged conduct is proven to "create a likelihood of confusion or of misunderstanding." R.I.Gen.Laws §6-13.1-1(6)(xii), (xiv). To determine if a practice is deceptive, this Court looks at the evidence to determine if there has been a "representation, omission, or practice, that [2] is likely to mislead consumers acting reasonably under the circumstances, and [3], the representation, omission, or practice is material." *Long v. Dell, Inc.*, 93 A.3d 988, 1003 (R.I. 2014).

It is clear that the evidence before this Court does not meet that standard because there is no indication that PPS, nor anyone at its direction or on its behalf, engaged in any conduct that could be reasonably likely to create confusion. At the end of the day, no matter what discussions went on between Williams, Joana, and Marie they were not at the direction of PPS and all would have been prevented if Marie and Joana bothered to read the documents, listened to Attorney Catarina's explanation of the documents, or ask a single question before singing the purchase agreements or deed in the transaction. At no point in time did PPS, through Seyboth or Messier, have a single conversation with the Delvas about the purchase of the Property not did PPS compensate, engage, or employee Williams to arrange the purchase. *Exhibit 1*, p. 47, ln. 12-18.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-cr-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 42 of 56

## A. Marie Delva speaks and reads English.

The biggest charade in this entire case is that Marie Delva does not have the ability to speak, understand, or read English despite her false claims in the affidavit she signed but apparently never bothered to read. *Exhibit 2*, *Exhibit 1*, at p. 36, ln. 7-12; p. 37, ln. 2-8. She has lived in this country for approximately 41 years. She has raised six children of which five are only able to converse with her in English since they do not speak Haitian Creole. She learned the English language at least back in 1999 when she studied to become a CNA. *Id.*, at p.32, ln. 5-8.   By her own admission, she learned English from her CNA class teacher. She learned to read and understand enough English to pass the test and become a CNA without the assistance of an interpreter. *Id.*, at p. 32, ln. 12-19. She has continued to work with patients in an English speaking workplace ever since.

The fact is Marie knew, or should have known, what going on when she signed the papers to sell the Property. Marie's daughters Joana and Sheila testified that Marie speaks and reads English sufficient to have been able to reach the purchase and sales agreement and deed she signed in this transaction. Specifically, Joana testified under oath that Marie "understands English to know what selling a house is. *Exhibit 8*, at p. 22, ln 16-18. While in one breadth she claims that her parents did not know what was happening, she undermines her own testimony by stating that her parents told Catarina in the closing that they did not want to sell their house.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 43 of 56

After making that statement, Joana had to admit that if that actually did happen, then her parents clearly needed to understand what they were signing were sale documents, not refinancing documents. *Id.*, at p. 63, ln. 2-23; p. 64, ln. 3-9.

Sheila was even more clear in her testimony that Marie could read and understand enough English to have understood the transaction if she bothered to read any of the documents. Sheila testified that Marie is able to read English. *Exhibit 10*, at p. 16, ln. 1-15; p. 21, ln. 1-13. She stated that she even confronted and chastised Marie about why she signed papers to sell the house without reading them. Sheila testified that Marie could have clearly seen and understood that she was selling the Property if she had read it. In response, Marie told Sheila that she was "too tired" to read the documents and just signed them. *Id.*, at p. 22, ln. 12-19. In fact, Sheila testified that even Jean Marie understands enough English to understand the implications of the words "buy" and "sell" such that he would have understood them when Attorney Catarina explained the documents to them in English. *Id.*, at p. 16, ln. 1-6.

Marie came into her deposition trying to pretend she couldn't speak English but it did not last very nor hold up credibly. Throughout the deposition, Marie continuously answered questions about the transaction, including complicated ones, without waiting for the interpreter to translate the question. She even corrected the interpreter's English at one point. *Exhibit 1*, at p. 4, ln. 18-25; p. 5, ln. 12-24; p. 7, ln. 8-12; ln. 23-25; p. 8, ln. 4-11; ln. 14-18; p. 17, ln. 20-25; p. 18, ln. 1-8; p. 18, ln.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 44 of 56

20-23; p.21, ln. 1-10; p. 29, ln. 12-22; p. 33, ln. 23-25; p. 34, ln. 1-3; p. 35, ln. 6-21; p. 54, ln. 8-21; p. 65, ln. 14-25. Marie also was able to read documents, including her affidavit, purchase and sales agreements, and the deed during the deposition without the assistance of the interpreter. *Id.*, at p. 39, ln. 6-25; p. 40, ln. 1-17; p. 52, ln. 4-6; p. 65, ln. 14-25; p. 72, ln. 7-22.  She is objectively proficient enough in English to have been able to tell she was signing a purchase and sales agreement and deed to convey her Property to PPS and thus the idea that the conduct of PPS was of a nature that took advantage of her level of proficiency in English is disproven.

Reluctantly, Marie had to admit that she could read and understand the documents at issue in this case. She testified that she could read the words "buy", "sell", and "refinance." She regarded those words as "basic" English. *Id.*, at p. 24, ln. 10-25; p. 25, ln. 1-5. Marie stated that she knew the word "deed" and what it meant from her previous real estate transactions. *Id.*, at p. 25, ln. 13-25; p. 26, ln. 1-4. Marie initially said she could not read paragraph 7 of her affidavit but under cross examination she admitted that was a lie and that she was able to read and understand the paragraph. *Id.*, at p. 40, ln. 22-25; p. 41, ln. 1-6.

Aside from the deposition, Marie conversed in English with Sheila and Williams on the recorded telephone calls that Sheila produced. *See Exhibit 3*, *Exhibit 9*. Not only did she speak English, Marie described the nature of the very transaction that

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627     Doc 34-2     Filed 12/02/25     Entered 12/02/25 19:45:25     Desc
Exhibit B     Page 45 of 56

she now claims not to understand, i.e., that Joana was going to have a year to purchase the house. *Exhibit 3*, at p.22, ln. 17, 21; p. 23, ln. 10-25; p. 24, ln 1.

The evidence is clear – Marie Delva speaks sufficient English to have understood exactly what was going on related to the sale of the Property. Defendants submit that the evidence is also clear that all the Delvas are lying and they all knew what was going on. However, if Marie really believed that she was singing a refinance it was not because of any deceptive act of PPS, Seyboth, or Messier.  Rather, it was because she didn't bother to read the documents, ask questions, or pay attention.

## B. Marie and Joana Delva's own negligence is to blame for their "confusion".

Regretting a decision made due to one's own negligence does not trigger a cause of action under the DTPA. The evidence makes it clear that there were no actions taken by PPS, its owners, or any agent at its direction, that misled or deceived the Delva's into selling the Property. If the Delvas really believed that they were signing a refinancing agreement, all Marie and Joana had to do *was read* the documents that were signed, listen to the explanation of the documents by Attorney Catarina, ask for clarification, ask for an interpreter, or even just tell someone, particularly the closing attorney, that they were confused. Any one of those actions would have led to the clear understanding that a sale was taking place, not a refinance. In a light most favorable to the Delvas, this transaction is a result of their own negligence. The more likely conclusion is that Marie and Joana knew exactly what was happening but now

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 46 of 56

that it didn't work out are pretending to be confused to save face with Jean Marie and the rest of the family.

Joana Delva negotiated a transaction with Lowell Williams to find a buyer for the Property willing to purchase the Property to prevent foreclosure while also agreeing to give her a year to purchase that Property back. *Exhibit 12*, at p. 12, ln. 7-15; p. 18, ln. 3-7; p. 96, ln. 15-21. Mr. Williams found that willing purchaser in PPS. The transaction played out exactly as Marie, Joana, and Williams discussed it would, except that Joana couldn't get financing to buy the Property back. Now, the Delvas collectively complain that they were confused. If that is to be believed, it is only the result of their own negligence.

Marie Delva was negligent in that she did not read any of the documents at issues in this case, from her sworn affidavit to the purchase and sales agreement, to the deed, and even the certification that Attorney Catarina explained everything to the Delvas at the closing. *Exhibit 1*, at p. 36, ln. 7-12; p. 38, ln. 2-8; pp. 51-52; p. 61, ln. 9-14; p. 81, ln. 1-25; pp. 88-89. She signed each of these documents without reading them. Contrary to the lies in the Complaint, she did not fail to read these documents because she was not able to due to "limited English proficiency." She didn't read them because she simply didn't feel like it. Ms. Delva has admitted that she would have been able to read and understand the purchase and sales agreement. *Id.*, at p. 61, ln. 9-14. She admitted that she could have read and understood the deed. Despite

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 47 of 56

that ability, she simply chose not to apparently because she "was tired" and "didn't have time." And, most importantly, she admits that if she had read them, she would have seen what she was doing and not signed them because she says she didn't want to sell the house. *Id.*, at p. 88, ln. 25; p. 89, ln. 1-3.

Marie Delva "made her own bed" through her carelessness and inattention. If she sold her house under a false assumption that she was refinancing, she has no one to blame but herself. *Id.*, p. 60, ln. 2-23.  She has testified that none of the Defendants ever mentioned refinancing to her and that she just assumed, on her own, that she was got to close the refinancing of the mortgage instead of the sale. *Id.*  The DTPA does not unwind a sale of a transaction because a seller does not read a clear and unambiguous contract that identified itself as a "Purchase and Sales Agreement" in bold type. *See Exhibit 4.*

Even more ridiculous, Joana Delva was right there with her parents the entire time. She is born, raised and educated in this country. She is fluent in English as her native language. She negotiated the transaction on behalf of her parents. Yet, her parents claim that she never told them that the house was being sold to PPS and was going to be repurchased back into the family by her. If Joana misled her parents, that is not the fault of PPS, Seyboth, or Messier who never met Joana or the Delvas before the closing. If Joana misstated the truth, then liability lies with her, not the Defendants.

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 48 of 56

Joana saw the documents. She claims, without any credibility, that she was confused by the purchase price on the documents selling the Property to PPS. Yet, she clearly understood the very same language that would have conveyed the Property back to her. *Exhibit 8,* at p. 42, ln. 1-19; p. 51, ln. 20-25; p. 52, ln. 1-2. She was there with her parents when Catarina told them they were signing documents to sell the Property. She never asked for an interpreter, stopped the closing, or asked for clarification. *Id.*, at p. 72, ln. 24-25; p. 73, ln. 1-5; p. 65, ln. 12-22; p. 100, ln. 3-24. Due to the uncontroverted fact that the Delvas never spoke with the Defendants about the transaction directly, the only person who could have lied to Marie and Jean Marie that they were signing loan documents instead of sale document was their own daughter, not the Defendants. There is zero evidence that the Defendants directed Joana to lie to her parents.

The simple truth is that Joana and Marie could see, if the bothered to look at the documents, that they were sale documents. The simpler truth is that if they bothered to listen to Attorney Catarina, an officer of the Court, explain the documents they were signing, they would have been crystal clear that they were signing sale documents. If they asked a question, for more time, for an interpreter, or hired an attorney (as in the divorce), all of this would have been prevented at the closing table. The only ones in the closing room who would have known that there was a lack of understanding was the Delvas, two of whom were unquestionably able to

47

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 49 of 56

understand the language being spoken and being read, and neither of them did a single thing to intercede.

Instead, due to their lies or their negligence, two years later PPS, Seyboth, and Messier face litigation for having done nothing wrong. The fault lies with the Delvas – either for their dishonesty or their negligence. The only way to find in their favor is to believe the outlandish allegation that they told Attorney Catarina that they were not there to sell their home and that they needed an interpreter only for him to ignore them, risking his law license, and proceed anyway.

### C. If there was any deception, Marie Delva and Joana Delva deceived Jean Marie Delva into signing documents without any knowledge or involvement of the Defendants.

In her deposition, Marie acknowledged that she never discussed the transaction with Seyboth or Messier. She also acknowledged that she and her husband delegated the matter to Joana to handle. *Id.*, at p. 48, ln. 13-23; p. 59, ln. 1-23; Marie stated that she never even discussed the terms of the transaction with Williams. *Id.* Rather, she went by what Joana told her and, critically, her own false assumptions. *Id.*, at p. 60, ln. 3-23.  Marie admitted that none of the Defendants, not even Mr. Williams, ever said to her or her husband that she would be signing documents to refinance the mortgage as opposed to selling the home to PPS. *Id.*

Marie admitted that she never told her husband that she had not read any of the documents she told him to sign. *Id.*, at pp. 86-87. She never told Jean Marie that

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 50 of 56

she was just "assuming" without ever even being told by any one of the Defendants
or Attorney Catarina that they were signing refinance documents rather than
purchase documents. *Id.*, at p. 59, ln. 1-23. Marie acknowledged that *she* was the
only one who told Jean Marie that this transaction was a refinance. *Id.* She knew that
she could have read English well enough to understand the documents, that she
didn't read them, and that Jean Marie was relying on her yet she never bother to
exercise her own due diligence by reading the documents nor was she honest with
him about what was really happening. *Id.*, p. 61, ln. 9-14; p. 86, ln. 18-25; p. 87, ln.
1-25. This is Marie Delva's fault, and her fault alone. It has nothing to do with the
Defendants, particularly PPS, Seyboth, and Messier, and thus there is no likelihood
of success on a claim under the DTPA to unwind this transaction and therefore the
injunction should not issue.

### D. PPS, Seyboth and Messier were not involved in negotiations with the Delvas and did not engage in deceptive practices.

The evidence is uncontroverted that Seyboth and Messier never made
misrepresentations or omissions to induce the Delvas into selling the Property. PPS's
purchase of the Property with an agreement to give Joana a one year exclusive right
to purchase the Property does not violate any statute. PPS was approached by Lowell
Williams. *Exhibit 13*, at p. 20, ln. 11-14. He was not directed to contact the Delvas
or get involved with them in anyway by Seyboth or Messier. On his own volition,
Williams endeavored to help the Delvas avoid foreclosure. He came to Seyboth with

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-cr-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 51 of 56

two simple questions – what would you be willing to by this house for and hold it for a year to give them a chance to buy it back? By agreeing to pay the Delvas $100,000.00 and let Joana have year to buy it back, PPS did not deceive anyone. In fact, PPS is the only party to this transaction that has lived up to its contractual obligations. *Id.*, at p. 26, ln. 4-24; p. 27, ln. 2-10.

The Delvas all admit that they never met Seyboth prior to the signing of the documents or the closing. The Delvas have admitted that none of the Defendants represented that the documents being signed were refinancing documents. The Delvas have also admitted that none of them ever told PPS, Seyboth, or Messier that they were confused about the transaction or that they did not want to proceed with the transaction. Marie Delva admitted, as discussed several times herein, that she just "assumed" without justification and not based on any representation from the Defendants, that she was refinancing her mortgage. She admitted that she never raised that question with the Defendants or the closing lawyer prior to signing the documents.

The Plaintiffs have not presented any evidence that Williams was acting at the direction of PPS. *Id.*, at p. 15, ln. 8-21. The Plaintiffs cannot overcome the overwhelming testimony from the depositions that Joana and Marie were able to understand exactly what was going on and either (1) agreed to the transaction, (2) didn't read any of the documents or listen to the explanation of what was being

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-cr-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 52 of 56

signed, or (3) Joana lied to her parents on her own volition in an effort to get the house into her name without sharing her corrupt intentions with any of the Defendants. In any scenario, PPS has not violated the DTPA and there is no reasonable chance that the Plaintiffs are going to succeed on the merits of the case given the evidence before the Court at this moment.

### III. There is no irreparable harm and thus the standard for injunctive relief is not met.

Putting the baseless and sanctionable hyperbole in the Complaint aside, this is case about money. The Delvas made a deal to sell their house for $100,000.00 and now have it in their heads that they should be paid $450,000.00. The goal of the Complaint is to unwind the transaction so they Delvas can get their "equity" back. As such, while the Complaint claims to seek to merely enforce the DTPA, it is really a Complaint that seeks relief that can be compensated for in money damages. As this Court is aware, it is axiomatic that when money damages are available as a remedy at law, injunctive relief is not permitted. *In re State Employees' Union*, 587 A.2d at 926.

The Plaintiffs are desperate to avoid the application of this prong of the injunction analysis because they know they cannot meet it. Plaintiffs claim that they are seeking to enforce the law and prevent the violation of the DTPA which should establish for them, as the Office of Attorney General, the requisite proof of irreparable harm. However, that would only apply if the Plaintiffs had established that the Defendants,

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 53 of 56

specifically PPS who is the target of the injunction, have (1) engaged in unlawful deceptive conduct and (2) continue to do so in a way that jeopardizes the public at large from similar claims of harm as alleged here.

Despite claiming, upon information and belief, that the "Defendants" have engaged in widespread deceptive conduct, the Plaintiffs have not presented even a scintilla of evidence in support of that claim. This case is about one Property, one family, and one purchaser. That's it. The Plaintiffs are not permitted to hide by the title of their office to avoid proving the irreparable nature of harm if this house is not marketed for sale while this action is pending. Rather, they need to establish a wider purpose and need to restrain this Defendant, PPS, from conduct or actions in violation of the DTPA. Selling this house does not work toward that end. If the Plaintiffs are successful, this Court has the power to disgorge PPS of its gains from the sale and order payments to the Plaintiffs for the benefit of the Delvas. Accordingly, the alleged harm, however outlandish, is not irreparable in nature and the Motion should be denied.

### IV.    The balance of the equities tip in favor of denying the injunction.

In this case, the Plaintiffs are not vindicating the rights of the public at large. They are essentially serving as pro bono attorneys for the Delvas in the Delvas question to unwind a transaction that did not work out the way they hoped. Despite the extensive discovery in this case since it was filed, there is not a single piece of

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

1:25-bk-10627    Doc 34-2    Filed 12/02/25    Entered 12/02/25 19:45:25    Desc
Exhibit B    Page 54 of 56

evidence that PPS, Seyboth, or Messier have engaged in any sort of systematic, wide ranging, or ongoing scheme to deceive homeowners facing foreclosure into unfair transactions. There isn't even a prima facie case that PPS did anything wrong in this transaction before the Court. As such, it would be unjust to enjoin PPS from selling the Property and forcing it to continue to allow the Delvas to live in the Property, rent free, as they have for the past two years. If that is permitted, PPS will continue to suffer undue financial harm by paying for and maintaining a Property at its expense, while not being able to collect any rent or offset its expense, while the Delvas live for free. That cannot be said to be in the interest of the public at large, it is only in the Delvas interest and it is unjust.

## V.     The granting of the injunction does not preserve the status quo as it existed prior to the suit being filed.

In order for injunctive relief to be granted, the movant bears the burden of proof of establishing each element required for an injunction to issue. The Plaintiffs have failed to meet their burden of proof as to any element thus far. Granting this injunction would not serve the purpose of preserving the status quo prior to the filing of the lawsuit. *EMB Assoc., Inc. v. Sugarman*, 372 A.2d 508, 509 (R.I. 1977). Prior to the lawsuit being filed and the restraining order being stipulated to before litigation counsel was engaged by PPS, PPS has free reign over its rights and decisions related to the Property. PPS was actively marketing the property for sale in a strong market. By enjoining PPS from selling the Property, this Court would be

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627   Doc 34-2   Filed 12/02/25   Entered 12/02/25 19:45:25   Desc
Exhibit B   Page 55 of 56

interfering with PPS property rights which it has accrued by virtue of an arm's length, lawful, and clearly contracted for transaction. If the injunction is granted, the Court is preserving the status quo as it existed after the granting of the TRO, rather than maintaining the status quo of the last "peaceable moment" between the parties. *Id.* As such, this Court should deny the injunction as the status quo prior to suit was that PPS was actively trying to sell this Property that it has been holding, paying taxes on, and maintaining for the past two years.

## CONCLUSION

For the reasons stated herein, this Court should deny the Motion for Preliminary Injunction and vacate the Temporary Restraining Order related to the Property and allow PPS to fully exercise its right to control, maintain, and/or dispose of the Property.

*[Remainder of Page Intentionally Left Blank]*

*[Signatures on Next Page]*

Case Number: PC-2024-05896
Filed in Providence/Bristol County Superior Court
Submitted: 7/11/2025 2:23 PM
Envelope: 5214264
Reviewer: Carol M.

Case 1:25-bk-10627   Doc 34-2   Filed 12/02/25   Entered 12/02/25 19:45:25   Desc
Exhibit B   Page 56 of 56

Respectfully submitted,
Defendants,

Preferred Property Solutions, LLC;
Kyle Seyboth; Red Balloon Capital,
LLC; and The Seyboth Real Estate
Team, Inc.,

By their attorneys,

*/s/ Nicholas J. Hemond*
Nicholas J. Hemond, Esq. (#8782)
Laura A. Nicholson, Esq. (#8440)
DarrowEverett LLP
One Turks Head Place, Suite 1200
Providence, RI 02903
Tel.: (401) 453-1200
Fax.: (401) 453-1201
nhemond@darroweverett.com
lnicholson@darroweverett.com

Dated:  July 11, 2025

## **CERTIFICATION**

I hereby certify that on this 11th day of July 2025, I filed and served this document through the electronic filing system on all registered service contacts for this case.

The document electronically filed and served is available for viewing and/or down-loading from the Rhode Island Judiciary's Electronic Filing System.

/s/ Sarah Roodenburg